UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

RONALD DAVID HARRIS, #584414,    )
                                  )
            Petitioner,           )
                                  )      NO. 3:22-cv-00443
v.                                )
                                  )
BERT BOYD, Warden,                )
                                  )
            Respondent.           )

MEMORANDUM OPINION

Before the Court is a pro se petition for writ of habeas corpus under 28 U.S.C. § 2254 filed by Petitioner Ronald David Harris, who is incarcerated at the Northeast Correctional Complex in Mountain City, Tennessee. (Doc. No. 1). Harris challenges his convictions and sentences in the Rutherford County Criminal Court for three counts of especially aggravated sexual exploitation of a minor, for which he was sentenced to three consecutive 10-year prison terms. Respondent has filed an Answer to the habeas petition (Doc. No. 9), and Petitioner has filed a Reply (Doc. No. 13). The petition is ripe for review, and this Court has jurisdiction pursuant to 28 U.S.C. § 2241(d). For the reasons below, the petition will be denied, and this action will be dismissed by separate Order.

I.      PROCEDURAL HISTORY

Harris was charged in Rutherford County with 13 counts of statutory rape by an authority figure, 13 counts of especially aggravated sexual exploitation of a minor, and one count of sexual exploitation of a minor (over 100 images), all stemming from Harris's video recording and photographs of sex acts with his minor stepdaughter until she was 15 years old. (See Doc. No. 8-7 at PageID# 648). Harris was also indicted in Wilson County for nine felony offenses based on similar acts against the same child beginning at age 12. See id. at PageID# 648−49. Pursuant to

1

coordinated negotiated plea agreements, Harris pled guilty in Rutherford County to three counts of especially aggravated sexual exploitation of a minor and in Wilson County to one count of rape of a child. All remaining charges were dismissed, and Harris agreed to three consecutive 10-year prison sentences for the Rutherford County crimes and one concurrent 25-year prison sentence, plus lifetime supervised release, for the Wilson County crime. He was sentenced accordingly.

Harris did not file a direct appeal, but he filed a timely petition for state postconviction relief in Rutherford County. After counsel was appointed, Harris filed two amended petitions. He alleged that trial counsel was ineffective for failing to (1) "properly investigate and prepare for trial"; (2) interview witnesses, including Harris's ex-wife; (3) "adequately relay plea offers"; (4) review all discovery materials; (5) argue that Harris was selectively prosecuted in violation of the Fourteenth Amendment; and (6) file a motion to suppress evidence based on an alleged Fourth Amendment violation. (Doc. No. 8-1 at PageID# 116−118, 142, 193). He also raised stand-alone claims that the State suppressed evidence in violation of due process, that his sentence was excessive in violation of the Eighth Amendment, that the State violated his plea agreement, that judgment for one of his convictions was never executed, and that his attorney was denied access to evidence. Id. at 118−19. After an evidentiary hearing, the trial court denied relief on all grounds. Id. at PageID# 195−204; (Doc. No. 8-3) (evidentiary hearing transcripts).

On postconviction appeal, Harris presented only two grounds for reversal: (1) trial counsel was ineffective for failing to file a motion to suppress based on an alleged Fourth Amendment violation and (2) trial counsel was ineffective for changing strategy to focus on plea negotiations after viewing the evidence against Harris. (Doc. No. 8-4 at PageID# 449−50). The Tennessee Court of Criminal Appeals affirmed. (Doc. No. 8-7); *Harris v. State*, No. M2020-01619-CCA-R3-

2

PC, 2021 WL 6065318 (Tenn. Ct. Crim. App. Dec. 22, 2021). The Tennessee Supreme Court denied Harris's application for discretionary review. (Doc. No. 8-9).

Harris next filed a 28 U.S.C. § 2254 petition for writ of habeas corpus in this Court. In it, he raises the following grounds for relief:

1) trial counsel was ineffective for failing to research and investigate a potential Fourth Amendment challenge;

2) trial counsel was ineffective for failing to file a motion to suppress on Fourth Amendment grounds;

3) trial counsel was ineffective for failing to review all discovery materials and failing to understand what some of the discovery meant;

4) the postconviction trial court did not address a particular Sixth Circuit case in its oral ruling on Harris's postconviction petition and improperly distinguished the case in its written ruling;

5) Harris never received or was allowed to possess a personal copy of his discovery materials; and

6) Harris's plea was unknowing and involuntary, and trial counsel's performance during plea negotiations was deficient.

(Doc. No. 1).

Respondent filed an Answer, arguing that Ground 4 is not cognizable on habeas review, Grounds 5 and 6 are procedurally defaulted and without merit, and Grounds 1, 2, and 3 are without merit. (Doc. No. 9). Petitioner filed a reply, which argues that his claims are not defaulted and that he is entitled to habeas relief. (Doc. No. 13).

## II.    STATEMENT OF FACTS

A.  Change-of-Plea Hearing

The State recited the following facts at Harris's change-of-plea hearing:

[H]ad this matter ... proceeded to trial, the State's witnesses would be available and would testify that Mr. Harris is the stepfather and was married to the mother of the victim named in the indictment whose date of birth is 1-8-2001.

3

The family all lived together in Wilson County prior to moving to La [V]ergne, Tennessee here in Rutherford County approximately a year or so prior to the events alleged in this particular indictment. They lived together in Rutherford County . . . here in La [V]ergne.

And on August the 22nd of 2016, the victim's mother walked into the La [V]ergne Police Department to report that she had found a hard drive that she indicated to officers belonged to Mr. Harris. And that contained on that hard drive were images and videos depicting sexual contact between her husband, Mr. Harris, and the minor victim in this matter.

Detectives spoke with the victim's mother and secured a search warrant on the property. They executed the search warrant and seized a number of electronic items, including the hard drive in question.

Detectives did a forensic analysis of this hard drive and found multiple videos and images of sexual activity—depicting sexual activity between Mr. Harris and his, at the time, 15-year-old stepdaughter.

....

Mr. Harris was interviewed by detectives, and he acknowledged some sexual contact with this victim. He acknowledged that there would be some videos. It's clear in the videos that Mr. Harris is the one who set up the cameras and created the images.

Subsequent to the search warrant being executed, the minor victim was forensically interviewed. And she indicated that the sexual contact began when the family still lived in Wilson County, and began when she was about 12 years old. Mr. Harris is also charged with multiple counts of rape of a child in Wilson County.

(Doc. No. 8-2 at PageID# 258−60). Harris affirmed under oath that he "agree[d] or conced[ed] . . .

that the State's statement of facts, as well as those set out in [his] indictment are essentially true

and correct." Id. at PageID# 266.

B.  State Postconviction Review

The Tennessee Court of Criminal Appeals summarized the evidence from Harris's

postconviction evidentiary hearing:

The post-conviction court conducted an evidentiary hearing at which Detective Matt Fracker with the La Vergne Police Department, Detective Tyler Smith with the Murfreesboro Police Department, Assistant District Attorney Sharon Reddick, the petitioner's trial counsel, and the petitioner testified.

4

Detective Matt Fracker testified the petitioner's then-wife, J.H., came to the police department and reported the allegations against the petitioner. J.H. informed the detective she discovered an external hard drive in the petitioner's dresser drawer inside a pair of his swimming shorts. She connected the hard drive to her computer and saw a file folder labeled "San Diego Chargers" with the thumbnail image a picture of her daughter, the victim. She opened the folder and saw multiple sexually explicit pictures and videos of her daughter. She copied the digital files to another external hard drive, which she provided to Detective Fracker.

Detective Fracker accessed the hard drive on the police department's offline computer. He noted there were "thousands of pictures of child pornography"; specifically, photos of both the victim and her sister and videos of the victim. Detective Fracker pulled up the first ten to twenty files or images within the "San Diego Chargers" folder in order for J.H. to identify her daughter and the petitioner. Detective Fracker did not know if he viewed the exact files J.H. had viewed before she brought the hard drive to the police.

Detective Fracker recalled asking J.H. for consent to search her home, and she consented both orally and in writing. Officers detained the petitioner until the search warrant arrived and then a search of the home was conducted. Several electronic devices were seized during the search, including the hard drive J.H. had found in the petitioner's dresser drawer. The seized items were sent to Murfreesboro Criminal Investigations Division ("C.I.D.") for processing. Detective Fracker later viewed more of the seized digital information at the Murfreesboro C.I.D. office, and he characterized the images and videos as "disturbing.... It was an adult having sexual intercourse with a child.... [T]here were over 4,000 images."

Detective Fracker testified that the victim was forensically interviewed, during which she disclosed multiple instances of sexual penetration perpetrated against her by the petitioner. The victim was unable to give an exact number of occurrences because "it was too many to even try to count." The victim said the sexual abuse started when she was twelve years old while the family was living in Wilson County. Detective Fracker interviewed the petitioner, and the petitioner admitted to having repeated sexual contact with the victim and video recording it.

Detective Fracker interviewed and spoke with J.H. on multiple occasions through email, phone calls, and in person, and he concluded there was no reason to request an indictment against her. Once criminal prosecution commenced against the petitioner, the petitioner filed a motion for J.H.'s laptop. Subsequently, her laptop and its hard drive were turned over to the Murfreesboro Police Department.

Detective Tyler Smith conducted the digital forensics examination of the electronic storage devices seized in this case. Detective Smith processed twenty-one devices from which he uncovered 4533 files containing child sexual abuse material, 4238 of which were of the petitioner and the victim. This total does not include duplicates of the files found on the hard drive in the petitioner's dresser drawer, which were also found on other devices seized from the home. According to Detective Smith,

5

it was clear from the files that the petitioner was the one setting up the video and that there was no evidence of any criminal culpability on the part of J.H. Detective Smith's digital forensics examination of the seized devices also uncovered typical non-illegal material.

General Sharon Reddick prosecuted the petitioner in the underlying matter and recalled only one pretrial motion being litigated. The motion involved the petitioner's request for any electronic equipment in the possession of J.H. which he believed might be useful to his case. As a result, J.H. was ordered to turn over her laptop, and a mirror image of her hard drive be secured by the State and made available to the defense. However, it was not clear whether defense counsel ever examined the information on J.H.'s hard drive because they started discussing a plea agreement. The petitioner insisted there was some wrong-doing on the part of J.H. but could never "articulate anything that rose to criminal culpability." General Reddick noted, "[a]t some time [the petitioner] wanted [the victim] prosecuted as well."

General Reddick recalled there was sufficient evidence the petitioner committed the offenses in addition to the digital files, including his admission during his original interview to having an on-going sexual relationship with the victim, disclosures by the victim of multiple instances of sexual penetration by the petitioner, and multiple letters written by the petitioner to the victim, J.H., and the prosecutors acknowledging the sexual contact with the victim.

The petitioner's trial counsel testified that he only represented the petitioner on his Rutherford County charges and that he visited the petitioner approximately thirty times at the jail. Counsel filed various motions in circuit court, as well as a subpoena for access to J.H.'s laptop computer. Counsel recalled the petitioner was concerned with accessing J.H.'s computer because he believed it would inculpate her in criminal activities. The petitioner talked to counsel about allegations of criminal conduct on the part of J.H. and also at various times blamed the victim for some of his criminal behavior. Once J.H.'s hard drive was taken into custody, counsel did not view its contents but knew the evidence was there if he needed it. Counsel continued,

> [A]t that point I began to look more at the evidence that was in the custody of the State.
>
> And when I saw what the State had against him—I saw numerous confessions. I saw videos with his face right there at the front of it, and then proceeding to do what he was accused of doing, at that point it became my focus—I guess my focus more than anything became ... what are the things I can control, what are the things I can address.
>
> And to me, a tangential allegation that someone else ... saved the videos or the images in question largely to me was irrelevant as to

> how they got there. I'm worried about, you know, how do I address
> my client's main concerns here."

Counsel elaborated there was a "mountain of evidence" against the petitioner, and counsel did not think allegations concerning J.H. would have reduced the petitioner's culpability in the eyes of the jury.

Trial counsel considered filing a motion to suppress, but he and the petitioner did not have a direct conversation about his doing so. He elaborated, "[W]hen I see that my client has tremendous evidence against them, the first thing I look to is whether or not the search warrant would stand up. So, I don't remember exactly what I may have researched. But, of course, that's always on my mind."

Trial counsel had several conversations with Detective Fracker and was aware how the digital evidence was obtained to get the search warrant for the petitioner's home. Asked if he was familiar with the Sixth Circuit case of Lichtenberger, counsel replied, "Not offhand." Counsel reviewed the seized digital evidence at the police department and was also given copies of letters written by the petitioner wherein he admitted to sexually penetrating his stepdaughter.

After reviewing all the evidence provided to him in discovery, trial counsel felt it was appropriate to start discussing a possible plea agreement with the petitioner. He had several conversations with the petitioner in that regard, and counsel negotiated a global settlement disposing of all the criminal allegations against the petitioner. Counsel sent a letter to the petitioner outlining the possible sentence ranges he faced on each of his charges and counsel's recommendation to accept the State's plea offer. Prior to the petitioner actually entering the plea, counsel went over the negotiated plea agreement with the petitioner and had him initial every provision to ensure he understood. Given counsel's thoroughness and the petitioner's intelligence, counsel believed there was "no reason why he wouldn't have understood what we were doing."

Trial counsel recalled that on the morning of the plea hearing, the petitioner requested to speak with a male prosecutor from the district attorney's office because he was concerned that the female prosecutor assigned to his case was biased because of her gender. The petitioner sat down with counsel and a male prosecutor and discussed his theory of J.H.'s criminal liability and, after doing so, entered his plea.

The petitioner was the last to testify at the evidentiary hearing. A large part of the petitioner's testimony concerned his desire for trial counsel to obtain a mirror image of J.H.'s computer because she had moved out of state. The petitioner claimed J.H. told Detective Fracker that she learned about the improper things going on between the petitioner and her daughters two years earlier when she found nude photographs of the petitioner and the girls on a camera. The petitioner believed J.H.'s computer contained evidence she had knowledge of his sexual abuse of the victim and her threatening to turn him in if he did not allow her to move to Las Vegas with the

children. However, the petitioner acknowledged J.H.'s actions would not lessen his culpability, but he claimed there was "selective prosecution" by the State.

The petitioner also testified that he discussed with trial counsel his desire for counsel to file a motion to suppress the search of the hard drive discovered by J.H. He claimed J.H. had control of the hard drive found in his swim shorts "for a long time ... [because] she was extorting [him]." He asserted that J.H. knew the abuse was going on and did not care and that she did not have permission to take the hard drive from his dresser drawer.

The petitioner disputed trial counsel's claim to have visited him thirty times and claimed he "was not able to see really any of this discovery." The petitioner averred trial counsel threatened to withdraw from his case if the petitioner did not retract complaints he had filed against counsel with the Board of Professional Responsibility. When counsel advised the petitioner not to go to trial and did not listen to the petitioner's "own ideas on defense strategies," the petitioner began to feel counsel "might not be my guy" and "had given up on [him]."

The petitioner ultimately felt he had no other option than to continue with counsel representing him and to plead guilty. He particularly felt this way after counsel warned him "if [the victim] were to get up on the stand and cry, that 12 jurors would basically crucify me, and I would get, what, 13 charges times 30 years. Like 190 years or something crazy." He expressed, "So, I literally felt I had no options. None. None. Especially after not trying to suppress any of that evidence."

On cross-examination, the petitioner rehashed his claim that J.H. knew about the sexual abuse and did not turn him in sooner because she was extorting him for money. He also expounded on his allegations that J.H. should have been prosecuted and that he was "targeted by" the district attorney. When asked about his claim that one of his reasons for waiving a preliminary hearing was to protect the victim, the petitioner explained he was concerned about how sexually explicit photographs and videos of the victim being made public would affect her honor and dignity.

(Doc. No. 8-7 at PageID# 650−54) (record citations and footnote omitted).

### III.   STANDARD OF REVIEW

A.  <u>Procedural Default</u>

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." <u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner

8

must 'fairly present' his claim in each appropriate state court . . ., thereby alerting that court to the federal nature of the claim." Id. (citation omitted). In Tennessee, a petitioner is "'deemed to have exhausted all available state remedies for [a] claim'" when the claim is presented to the Tennessee Court of Criminal Appeals. Adams v. Holland, 330 F.3d 398, 401 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39).

A procedural default can occur in one of two ways. First, a procedural default may occur if the state court actually "relied on [a state] procedural bar as an independent basis for its disposition of the case." Caldwell v. Mississippi, 472 U. S. 320, 327 (1985). Second, if a petitioner fails to properly exhaust a claim in state court, and the claim can no longer be raised in state proceedings because of a failure to follow state procedure for presenting such a claim, the claim is "technically exhausted" but procedurally defaulted. Woodford v. Ngo, 548 U. S. 81, 126 (2006).

A petitioner may obtain merits review of a procedurally defaulted claim by demonstrating "cause and prejudice" for the default. Sutton v. Carpenter, 745 F.3d 787, 791 (6th Cir. 2014). To establish cause, the petitioner must show that "some objective factor external to his defense impeded his ability to comply with the state's procedural rule." Bies v. Sheldon, 775 F.3d 386, 396 (6th Cir. 2014). To establish prejudice, a petitioner must demonstrate that the constitutional error "'worked to his actual and substantial disadvantage.'" Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir. 1995) (quoting United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis omitted)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

B.  Merits Review

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." Woodford v. Garceau, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S.C. § 2254(d). Under this provision, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" Hill v. Curtin, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting Lockyer v. Andrade, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id. (quoting Harris v. Haeberlin, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"—instead, the federal court must find that the state court's application was

10

"objectively unreasonable." Id. (quotation marks omitted). Review under Section 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 182 (2011).

To clear the bar of Section 2254(d)(2), a petitioner must show that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." Young v. Hofbauer, 52 F. App'x 234, 236 (6th Cir. 2002). State court factual determinations may be found unreasonable only "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." Pouncy v. Palmer, 846 F.3d 144, 158 (6th Cir. 2017) (quoting Matthews v. Ishee, 486 F.3d 883, 889 (6th Cir. 2007)).

With these principles in mind, the Court will turn to the examination of the claims raised in Harris's petition for habeas relief.

## IV.   ANALYSIS

Harris raises six grounds in his petition for writ of habeas corpus. As explained below, all six grounds will be denied. Ground 4 is not cognizable on habeas review. Grounds 3, 5, and 6 are procedurally defaulted. Grounds 1 and 2 cannot overcome 28 U.S.C. § 2254(d)'s bar to relief. The Court addresses each set of claims in turn.

A.  Not Cognizable on Habeas Review – Ground 4

In Ground 4, Harris contends that the state postconviction trial court abused its discretion in denying his petition for state postconviction relief. (Doc. No. 1 at PageID# 10, 31−34). But "the Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review." Cress v. Palmer, 484 F.3d 844, 853 (6th Cir. 2007). Harris therefore cannot obtain habeas corpus relief on this claim.

11

B. Procedurally Defaulted – Grounds 3, 5, and 6

In Ground 3, Harris alleges that trial counsel failed to review some of the discovery materials and failed to appreciate what the discovery materials meant to his case. (Doc. No. 1 at PageID# 8). In Ground 5, Harris alleges that he never received his own personal copy of discovery, and he contends that this constituted a violation of the Fourteenth Amendment and Brady v. Maryland,[1] 373 U.S. 83 (1963). (Doc. No. 1 at PageID# 11, 36). In Ground 6, Harris contends that his guilty plea was unknowing and involuntary and that trial counsel's performance during plea negotiations was deficient. Id. at PageID# 13, 35.

Harris presented these claims in his state postconviction petition at the trial court level. (Doc. No. 8-1 at PageID# 116−19). He did not, however, present them to the Tennessee Court of Criminal Appeals on appeal from the denial of postconviction relief. (Doc. No. 8-4 at PageID# 445−50). The claims are therefore procedurally defaulted.

Harris does not argue that the cause-and-prejudice exception applies as to any of his defaulted claims. Indeed, he offers no basis for the Court to consider the merits of Grounds 3 or 5. The Court will therefore deny those claims based on procedural default.

As to Ground 6, Harris argues that this claim challenging the knowing and voluntary nature of his plea is "inherently intertwined" with his ineffective assistance of trial counsel claims. (Doc. No. 13 at PageID# 1067−68). Indeed, Ground 6, as presented in Harris's 28 U.S.C. § 2254 habeas corpus petition, largely rehashes his other claims. (Doc. No. 1 at PageID# 13, 35). The Court will not address these rehashed claims separately. To the extent Harris raises any

---

[1] This claim is more properly raised as an ineffective assistance of counsel claim, because Harris alleges that his attorney had access to the discovery and failed to turn it over to Harris. (See Doc. No. 8-3 at PageID# 382). Regardless of how the claim is framed, it is defaulted, and Harris does not offer a basis to excuse his default.

12

independent basis for relief in Ground 6 that was not presented to the Tennessee Court of Criminal Appeals, it is procedurally defaulted and will be denied on that basis.

C.  Relief Barred by 28 U.S.C. § 2254(d) – Grounds 1 and 2

In Ground 1, Harris contends that trial counsel was ineffective for failing to research and identify specific Fourth Amendment cases. (Doc. No. 1 at PageID# 5). In Ground 2, Harris contends that trial counsel was ineffective for failing to file a motion to suppress the digital images and video recovered on various devices throughout his home. Id. at PageID# 7. Both Harris and Respondent combine their respective arguments on these claims, (Doc. No. 1 at PageID# 20−30); (Doc. No. 9 at PageID# 714−18), and the Court will consider them jointly. As explained below, both grounds are barred by 28 U.S.C. § 2254(d).

   1.  *Applicable Law*

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. See Bell v. Cone, 535 U.S. 685, 694−95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. See Strickland v. Washington, 466 U.S. 668, 686−87 (1984). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

As discussed above, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law as clearly

established at the time in the holding(s) of the United States Supreme Court, "involved an unreasonable application of" such law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1), (2). Thus, where (as here) a claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Instead, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Harrington v. Richter, 562 U.S. 86, 101 (2011).

   *2. Discussion*

   The Tennessee Court of Criminal Appeals held that counsel's failure to research and file a motion to suppress on Fourth Amendment grounds was neither deficient nor prejudicial because, based on the evidence presented at the postconviction hearing, such a motion would not have been successful. (Doc. No. 8-7 at PageID# 9−13). Harris contends that this conclusion was contrary to, or based on an unreasonable application of, clearly established federal law.[2] (Doc. No. 13 at PageID# 1016−38). He has failed to meet his burden under § 2254(d)(1).[3]

   The Supreme Court has clearly established that when a private party provides police with evidence discovered during a private search, law enforcement's subsequent search of the evidence

---

[2] Harris's extensive arguments against the application of Stone v. Powell, 428 U.S. 465 (1976), (Doc. No. 13 at PageID# 1007−16), are unnecessary. Stone does not apply to a claim of ineffective assistance of counsel based on the failure to make a Fourth Amendment challenge. Kimmelman v. Morrison, 477 U.S. 365, 382−83 (1986) ("[W]e reject petitioners' argument that Stone's restriction on federal habeas review of Fourth Amendment claims should be extended to Sixth Amendment ineffective-assistance-of-counsel claims which are founded primarily on incompetent representation with respect to a Fourth Amendment issue.").

[3] It is black-letter law that counsel cannot be found ineffective for failing to bring a motion to suppress (or any other type of motion) that would have been unsuccessful. Tackett v. Trierweiler, 956 F.3d 358, 375 (6th Cir. 2020). Thus, to assess the reasonableness of the state court's holding under § 2254(d)(1), this Court must determine whether the Tennessee Court of Criminal Appeals reasonably concluded that there was no underlying Fourth Amendment violation. See A.M. v. Butler, 360 F.3d 787, 794−95 (7th Cir. 2004) (applying 28 U.S.C. § 2254(d)(1) to state court's holding that there was no underlying Fifth Amendment constitutional violation, when state court had found no underlying Fifth Amendment violation and therefore held that trial counsel was not ineffective for failing to file a motion to suppress on Fifth Amendment grounds).

14

is permissible under the Fourth Amendment if "there [is] a virtual certainty that nothing else of significance" will be discovered. United States v. Jacobsen, 466 U.S. 109, 119−20 (1984). While this "private search" exception is clearly established, federal circuits have split on how strictly to apply the exception when the search involves digital evidence.

The Sixth Circuit has construed the exception narrowly, holding that unless a law enforcement official is virtually certain that they are viewing the exact same digital files as were previously viewed, law enforcement's search exceeds the scope of the private search, so the exception does not apply. United States v. Lichtenberger, 786 F.3d 478, 490−91 (6th Cir. 2015) (finding that law enforcement's search of a laptop exceeded the scope of an earlier private search revealing child pornography, because the private searcher "was not at all sure whether she opened the same files with [law enforcement] as she had opened earlier that day").

In contrast, the Fifth and Seventh Circuits have construed the exception more broadly, holding that law enforcement's search is within the scope of an earlier private search so long as the law enforcement official is substantially certain that their search will reveal only the same type of contraband as the earlier private search. See Rann v. Atchison, 689 F.3d 382, 838 (7th Cir. 2012) ("[E]ven if the police more thoroughly searched the digital media devices than [the private searchers] did and viewed images that [the private searchers] had not viewed, . . . the police search did not exceed or expand the scope of the initial private searches. Because [the private searchers] knew the contents of the digital media devices when they delivered them to the police, the police were 'substantially certain' the devices contained child pornography."); United States v. Runyan, 275 F.3d 449, 465 (5th Cir. 2001) ("Because we find that the police do not exceed the scope of a prior private search when they examine particular items within a container that were not examined by the private searchers, we accordingly determine that the police in the instant case did not exceed

the scope of the private search if they examined more files on the privately-searched disks than [the private searchers] had. Suppression of any such files is therefore unnecessary.").

The state appellate court's opinion makes clear that the court did not consider itself bound by the Sixth Circuit's reading of Jacobsen. (Doc. No. 8-7 at PageID# 657) ("Lichtenberger, the authority the petitioner cites in support of suppression of the digital evidence, is merely persuasive authority."). And the opinion, while not citing Fifth or Seventh Circuit caselaw, applies the same test—substantial certainty that law enforcement's search would reveal only the same type of contraband that the private searcher had found:

> [I]t is clear from the proof that based on the extent of J.H.'s search, her statement to Detective Fracker, and the fact that the images viewed by both J.H. and Detective Fracker were all located within a file labeled with a picture of the victim that Detective Fracker could be "substantially certain" any picture he viewed contained child pornography.

(Id. at PageID# 658).

Harris argues that the state court's decision was contrary to, or relied on an unreasonable application of, Jacobsen.[4] (Doc. No. 13 at PageID# 1020−35). But his argument ignores the Fifth and Seventh Circuits' application of Jacobsen and incorrectly treats the Sixth Circuit's opinion as clearly established Supreme Court precedent:

> Petitioner has shown throughout his entire argument on this issue in his PCR, appellate and habeas briefs that the Lichtenberger court based its ruling on well established Supreme Court precedent; therefore, it is not mere persuasive authority, but is in fact, Supreme Court precedent that is binding on the TCCA.

---

[4] Harris also argues that the Respondent waived or forfeited any contrary argument. (Doc. No. 1 at PageID# 26−30). This argument is meritless for many reasons, but the simplest is this: a party cannot waive or forfeit § 2254(d)'s standard of review. See Moritz v. Lafler, 525 Fed. Appx. 277, 285 (6th Cir. 2013). This Court cannot review the merits of Harris's claims that were adjudicated on the merits in state court without first making one of the findings required by § 2254(d).

(Doc. No. 13 at PageID# 1046) (emphasis in original). This is facially incorrect. <u>Lichtenberger</u>'s reliance on clearly established Supreme Court precedent does not render <u>Lichtenberger</u> itself clearly established Supreme Court precedent.

On federal habeas review, it is not this Court's role to determine which reading of <u>Jacobsen</u> is correct. <u>Hill</u>, 792 F.3d at 676. The proper question is whether the Tennessee Court of Criminal Appeals applied <u>Jacobsen</u> reasonably. <u>Id.</u> That two other federal circuits have applied <u>Jacobsen</u> in precisely the same way as the Tennessee Court of Criminal Appeals is, at least, a strong indication that the state court's application was not unreasonable. <u>See</u> <u>Hall v. Zenk</u>, 692 F.3d 793, 799 (7th Cir. 2012) ("The fact that a circuit split exists on an issue may be indicative of a lack of clarity in the Supreme Court's jurisprudence."). Indeed, at least one circuit has held that "[w]hen the federal circuits disagree as to a point of law, the law cannot be considered 'clearly established' under 28 U.S.C. § 2254(d)(1)." <u>Evanstad v. Carlson</u>, 470 F.3d 777, 783 (8th Cir. 2006). We need not go quite so far as that. But to overcome § 2254(d)(1), Harris must show that the application of <u>Jacobsen</u> by the Tennessee Court of Criminal Appeals (echoing the approach of at least two federal circuit courts of appeal) was not just incorrect, but unreasonable. He has made no such showing, so § 2254(d)(1) does not provide an avenue for this Court to reach the merits of his claims.

Harris also argues that the Tennessee Court of Criminal Appeals relied on several unreasonable determinations of fact, such that Section 2254(d)(2) opens the door to merits review. Specifically, he asserts that the Tennessee Court of Criminal Appeals unreasonably determined that trial counsel considered filing a motion to suppress. (Doc. No. 13 at PageID# 1048−49). But the Tennessee Court of Criminal Appeals did not rely on this factual determination in adjudicating Harris's claims, so Harris cannot rely on it to overcome Section 2254(d)(2). <u>Rice v. White</u>, 660 F.3d 242, 250 (6th Cir. 2011) (""[I]t is not enough for the petitioner to show some

unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination.").

Harris also asserts that the Tennessee Court of Criminal Appeals unreasonably determined Detective Fracker had "'virtual certainty' that he was only going to view the exact same images that were seen in the private search." (Doc. No. 13 at PageID# 1087). But the Tennessee Court of Criminal Appeals never made such a finding. Indeed, the court acknowledged that "when questioned Detective Fracker was not sure whether he viewed the exact files J.H. viewed before bringing in the hard drive." (Doc. No. 8-7 at PageID# 658). As discussed above, the Tennessee Court of Criminal Appeals did not endorse Lichtenberger's strict construal of the private search exception, so the court did not need to find that all of the files Detective Fracker viewed had already been viewed by J.H. (Doc. No. 8-7 at PageID# 657).

Relatedly, Harris contends that the Tennessee Court of Criminal Appeals unreasonably determined Detective Fracker was substantially certain to view only child pornography when he conducted his initial search pursuant to the private search doctrine. (Doc. No. 13 at PageID# 1089−94). Harris explains that a forensic report shows he stored his homemade child pornography in multiple separate subfolders, all multiple layers down within the "Chargers stats 82-95" folder on his hard drive. Id. at PageID# 1093−94. According to Harris, this contradicts Detective Fracker's testimony that he viewed only the first "first handful" or "10, 20" files that he found. Id.; (see Doc. No. 8-3 at PageID# 297). However, Detective Fracker acknowledged that he did not recall precisely which subfolder he viewed. (Doc. No. 8-3 at PageID# 297) ("I looked at this—I know I looked at the one that I had found in the San Diego Chargers folder."). And, most importantly, there was no evidence before the state courts demonstrating that, within whichever "San Diego Chargers" subfolder Detective Fracker viewed with J.H., there was a meaningful risk

18

he would view material "of significance" within its photo or video files, other than child pornography.[5] Jacobsen, 466 U.S. at 118−19. Thus, Harris has not met his burden under 28 U.S.C. § 2254(e)(1) to show that the state court's presumptively correct factual finding—that Detective Fracker was substantially certain to see child pornography in "any picture he viewed" from a file identified using a photo of the minor victim (Doc. No. 8-7 at PageID# 658)—is rebutted by clear and convincing evidence and "do[es] not have support in the record." Pouncy, 846 F.3d at 158. He has therefore failed to show that the Tennessee Court of Criminal Appeals made a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Finally—and separately from the question of whether a motion to suppress would have been successful—the Tennessee Court of Criminal Appeals held that Harris had not met his burden of showing a reasonable probability that he would not have pled guilty and would have insisted on going to trial if counsel had filed the motion. (Doc. No. 8-7 at PageID# 659). This reasonable conclusion provides an independently sufficient basis for denying habeas relief. See Kimbrough v. United States, 71 F.4th 468, 473 (6th Cir. 2023) ("[To show prejudice] [a]fter a guilty plea, a petitioner must demonstrate 'a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

At his change-of-plea hearing, Harris explained under oath why he had decided to plead guilty:

> I do accept responsibility for my behavior. And I feel I need to be punished. I feel this is a fair punishment. There is a little light at the end of the tunnel, I think.

---

[5] Harris's unverified, apparently homemade flow chart, (Doc. No. 1-4 at PageID# 86), (1) is not reliable evidence and (2) was not before the Tennessee Court of Criminal Appeals. Harris therefore cannot rely on it to demonstrate an unreasonable determination of facts "in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

19

Considering my age and the 30 years, you know, I still may have a chance to have a little bit of a life left. So, I appreciate that.

The only reservation I have about accepting all these guilty pleas is that, you know, I still want to be a father to my seven children that are biologically mine. So, you know, I'm hoping that I can still somehow have a relationship with them.

But I mainly—I mainly have pled today to these charges to protect [the victim]. I didn't want her to have to go through a trial. I think she's been put through enough. And I just wanted, you know, to have her dignity and privacy not compromised by a trial. I'll always care for her. And that's all I really wanted to say.

(Doc. No. 8-2 at PageID# 272, 274−75). He also agreed that he did not "feel like [he had] been coerced or rushed to do this at all." Id. at PageID# 273.

At his postconviction hearing, Harris told another story, testifying that he pled guilty only because he felt pressured by his attorney to do so. (Doc. No. 8-3 at PageID# 391−92). But the postconviction trial court expressly credited Harris's change-of-plea testimony in finding that Harris had not shown a reasonable probability that he would have insisted on going to trial, even if counsel had filed a successful motion to suppress. (Doc. No. 8-3 at PageID# 410) ("[A]s [Harris] states in his allocution that he made before this Court that is contained in the transcript and that's an exhibit to his testimony, he's willingly choosing to plead guilty in some way to protect his— the victim."). The Tennessee Court of Criminal Appeals followed suit. (Doc. No. 8-7 at PageID# 659). Considering Harris's sworn statements at the change-of-plea hearing, it was reasonable for the Tennessee Court of Criminal Appeals to conclude that Harris had not made the required showing of prejudice. See Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity."); cf. United States v. Stewart, 198 F.3d 984, 987 (7th Cir. 1999) ("Entry of a plea is not some empty ceremony, and statements made to a [] judge in open court are not trifles that defendants may elect to disregard. A defendant has no legal entitlement to benefit by contradicting himself under oath. Thus when the judge credits the defendant's statements in open court, the game is over."). Because Harris has not demonstrated

with clear and convincing evidence that the state court's factual determination on this point was unreasonable, he cannot demonstrate prejudice for the alleged ineffective assistance of counsel, and he is not entitled to habeas relief. 28 U.S.C. § 2254(d)(2).

## V.    CERTIFICATE OF APPEALABILITY

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of Harris's claims, the Court will deny a certificate of appealability. However, Harris may seek a certificate of appealability from the Sixth Circuit.

## VI.    CONCLUSION

As explained above, Harris is not entitled to habeas corpus relief because his claims are not cognizable on habeas review, procedurally defaulted, or cannot overcome 28 U.S.C. § 2254(d)'s bar to relief. The petition therefore will be denied in its entirety, and this action will be dismissed

with prejudice. This Court will not issue a certificate of appealability, but Harris may seek one in the Sixth Circuit.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE